JUDGE PAULEY



SANJAY WADHWA
Senior Associate Director
Andrew M. Calamari
Nancy A. Brown
Tejal D. Shah
Adam S. Grace
Attorneys for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-1023 (Brown)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 15 CV 9764

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | 15 Civ. ___ ( ) |
| Plaintiff, | |
| v. | ECF Case |
| ATLANTIC ASSET MANAGEMENT, LLC, | COMPLAINT AND JURY DEMAND |
| Defendant. | |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Defendant Atlantic Asset Management, LLC, alleges as follows:

## SUMMARY OF THE ALLEGATIONS

1.       The Commission brings this enforcement action against Atlantic Asset

Management, LLC ("AAM").  AAM committed securities fraud by, among other things,

investing over $40 million of client funds in debt securities without telling its clients that the

investments would benefit individuals affiliated with one of AAM's owners.

2.       AAM is ostensibly owned and controlled solely by "Officer 1" and "Officer 2."

However, another entity, BFG Socially Responsible Investments Ltd. ("BFG"), holds a

significant ownership interest in AAM's parent holding company by virtue of its undisclosed capital investment in AAM.

3.      AAM never disclosed BFG's capital contribution to, and indirect ownership interest in, AAM to its clients or in its filings with the Commission, in violation of the federal securities laws, even after BFG's principal representative was charged by the Commission and criminally in an unrelated securities fraud.

4.      BFG has used its undisclosed ownership interest in AAM to dictate AAM's investment of its clients' funds in ways that benefitted BFG and its principals and affiliates.  In August 2014 and in April 2015, AAM invested a total of over $40 million of its clients' funds in dubious, illiquid bonds issued by a Native American tribal corporation (hereinafter, the "bonds" or "Tribal bonds").  The investments were made at the behest of individuals associated with BFG; the August 2014 investment was made by AAM's then-Chief Investment Officer, an individual BFG insisted that AAM hire, and who was subsequently charged with the unrelated securities fraud along with BFG's principal representative.

5.      AAM knew that entities associated with BFG would financially benefit from the sale of the bonds.  The bond proceeds were to be used to purchase an annuity provided by BFG's corporate parent.  In addition, a BFG-affiliated broker-dealer received placement agency fees in connection with the bonds' issuance.

6.      AAM never disclosed to its clients that it was investing their funds in investments that would financially benefit its undisclosed part-owners and financiers.

7.      Upon learning of the investments in the bonds, several of AAM's clients expressed concerns regarding the bonds' value and suitability, and demanded the investments be unwound.

8.      AAM has been unable to find buyers for the bonds and none of its clients has been able to liquidate its position in the bonds.  Recently, a BFG representative informed AAM that there is no market for the bonds and that they cannot be priced.

9.      BFG is again soliciting AAM's agreement to invest more client funds in transactions from which its principals and affiliates would financially benefit.  At the same time, as AAM resists those overtures, BFG is attempting to gain full control over AAM by seeking to remove AAM's officers.

## VIOLATIONS

10.      By virtue of the conduct alleged herein, AAM, directly or indirectly, singly or in concert, engaged and is engaging in acts, practices and courses of business, that constitute violations of Sections 206(1), 206(2), 206(4), and 207 of the Investment Advisers Act of 1940 (the "Advisers Act"), 15 U.S.C. §§ 80b-6(1), (2), and (4) and 80b-7, and Rule 206(4)-8 thereunder, 17 C.F.R. § 275.206(4)-8.

11.      Unless AAM is preliminary and permanently restrained and enjoined, it will continue to engage in the acts, practices and courses of businesses set forth in this Complaint and in acts, practices and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

12.      The Commission brings this action pursuant to the authority conferred upon it by Section 209 of the Advisers Act, 15 U.S.C. § 80b-9, seeking to restrain and permanently enjoin AAM from engaging in the acts, practices and courses of business alleged herein.

13.      The Commission also seeks, as immediate relief, a temporary restraining order and preliminary injunction order against AAM, the appointment of an independent monitor, an order requiring prior notice to the Commission before AAM assets are transferred to any of its

owners, an order granting expedited discovery, and an order prohibiting AAM from destroying, altering or concealing documents.

14.     Finally, the Commission seeks a judgment ordering AAM to disgorge ill-gotten gains with prejudgment interest thereon, and ordering AAM to pay civil money penalties pursuant to Section 209 of the Advisers Act, 15 U.S.C. § 80b-9.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action, and venue lies in this District, pursuant to Section 214 of the Advisers Act, 15 U.S.C. § 80b-14.  The Defendant, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the transactions, acts, practices, or courses of business alleged herein, certain of which occurred in this District.  For example, the placement agent for the sale of the bonds to AAM's clients, a BFG affiliate, is located in New York, New York.

## DEFENDANT

16.     **AAM,** formerly known as Hughes Capital Management, LLC ("Hughes"), is a Virginia corporation with its principal place of business in Stamford, Connecticut.  AAM also maintains offices in Alexandria, Virginia.  AAM has been registered with the Commission as an investment adviser since 1993.  It was initially registered under the name Hughes, but on April 2, 2015, Hughes was merged with an adviser named AAM and began doing business under the Atlantic name.  AAM is a wholly-owned subsidiary of GMT Duncan LLC ("GMT").

## OTHER RELEVANT ENTITIES

17.     **GMT** was formed as a Delaware limited liability corporation in December 2013 and acquired Hughes in July 2014.  Since GMT acquired AAM and merged it with Hughes in

April 2015, it has purportedly been operating under the name Atlantic Capital Holdings LLC.

Officer 1 and Officer 2 hold all of GMT's Class A interests.

18.    **BFG** was incorporated in Nevada in August 2014.  When GMT acquired Hughes,

BFG became the sole Preferred Member of GMT, holding all of its Class B interests.

## FACTS

19.    In December 2013, GMT was incorporated with the stated business purpose of

providing socially responsible fixed income investment management and advisory services as a

minority business enterprise.  At the time, GMT's sole members were its two individual

founders, Officer 1 and Officer 2.

20.    After GMT acquired Hughes, Officer 1 and Officer 2 became officers of Hughes.

And, after GMT acquired AAM, they maintained similar roles at AAM.

21.    GMT began negotiations to purchase Hughes, an investment adviser with

approximately $900 million under management, in mid-2014.  Needing capital for the

acquisition, Officer 1 and Officer 2 turned to BFG's principal representative, "BFG Individual

A."  In the course of GMT's negotiations with Hughes, on June 3, 2014, BFG Individual A

provided Officer 1 with a document to provide to Hughes's then owner to "demonstrate who

[the] financial sponsors are."  The document described several businesses owned by a private

equity control investor, including a broker dealer (herein, the "Placement Agent") and a

purported insurance company (herein, the "Annuity Provider").

22.    BFG Individual A also sent Officer 1 a term sheet outlining the terms of BFG's

proposed financing for GMT's purchase of Hughes, and stating that the financing would be

provided by the private equity control investor, directly or through the Placement Agent's

affiliate and/or its subsidiaries.

23.     In August 2014, BFG Individual A and another BFG representative ("BFG Individual B") incorporated BFG to use as the vehicle for their investment in GMT. According to an organizational chart of the Annuity Provider's parent company, BFG is wholly owned by the Annuity Provider.

24.     Around the same time, GMT entered into an amended and restated operating agreement "as of July 31, 2014" with its members, pursuant to which BFG became a "Preferred Member." BFG Individual B signed the agreement on behalf of BFG as its Managing Member. On July 31, 2014, BFG made an initial capital contribution of $2,660,618 to finance GMT's purchase of Hughes.

25.     On July 31, 2014, GMT purchased Hughes.

26.     Pursuant to GMT's amended and restated operating agreement, BFG was accorded certain privileges, including the right to designate one member to GMT's three member Board of Managers and to approve the selection of a Chief Investment Officer ("CIO") for GMT and Hughes.

**Hughes Conceals BFG's Ownership Interests in Its Post-Acquisition Filing with the Commission**

27.     Pursuant to the Advisers Act, investment advisers registered with the Commission are required to file a Form ADV upon registration and annually thereafter. Advisers must also file amended Form ADVs if any information in a prior filing becomes materially inaccurate.

28.     Among other things, the Form ADV requires advisers to identify every person that "controls" the adviser, including those with "the power directly or indirectly, to direct the management or policies of a person, whether through ownership of securities, by contract, or otherwise." And, according to Form ADV, "[a] person is presumed to control a limited liability

company ('LLC') if the person . . . has contributed 25 percent or more of the capital of the LLC…."

29.     Advisers are also required to identify their direct owners and indirect owners. If an indirect owner is an LLC, the adviser must disclose "members that have the right to receive upon dissolution, or have contributed, 25% or more of the LLC's capital."

30.     Hughes filed an amended Form ADV on August 29, 2014, disclosing its purchase by GMT. In the filing, Hughes disclosed that GMT had two "partners," Officer 1 and Officer 2, but failed to disclose BFG's capital contribution and indirect ownership in Hughes.

### Hughes Invests $27 Million of Client Funds in Illiquid Bonds That Financially Benefited BFG's Owners/Control People

31.     Immediately after GMT acquired Hughes, BFG Individual A exercised BFG's right to appoint a CIO (the "BFG-Appointed CIO").

32.     By August 14, 2014, just two weeks after the purchase of Hughes was completed, BFG Individual A and BFG-Appointed CIO proposed that Hughes invest client funds in the Tribal bonds.

33.     BFG Individual A provided Officer 1 with a draft trust indenture for the bonds. It revealed that the proceeds of the issuance were to be used primarily to purchase an annuity that would be provided and managed by BFG's parent company, the Annuity Provider. Although the draft trust indenture did not specify the fees the Annuity Provider would receive, Officer 1 knew, or was reckless in not knowing, it indicated that fees would be owed to the Annuity Provider for the provision and administration of the annuity. In fact, as detailed in the final deal documents relating to the bond issuance, the Annuity Provider's annual fees were disclosed as $.006 per $1.00 per annum on the full amount used to buy the annuity.

34.     In addition, pursuant to a Placement Agency Agreement for the bonds, the Placement Agent was to receive a $250,000 fee on the closing of the issuance.  Officer 1 knew about the Placement Agent's role in the transaction and knew, or was reckless in not knowing, that the Placement Agent would earn fees as a result.

35.     As Officer 1, knew, or was reckless in not knowing, BFG, BFG Individual A and BFG Individual B are affiliated with the Annuity Provider and the Placement Agent.  BFG Individual A serves as an advisor to the Board of Directors of one of the Annuity Provider's affiliates, has an e-mail address associated with one of the Placement Agent's affiliated companies, and was authorized to receive notices on behalf of the Placement Agent relating to the bonds.  At the time, BFG Individual B was the Director, President and Secretary of the Annuity Provider's corporate parent and a managing director of the Placement Agent.

36.     Officer 1 asked Hughes' compliance officer to conduct an analysis regarding whether the clients' investment guidelines allowed for purchase of the bonds.  The compliance officer concluded that pursuant to their guidelines, most of the clients would not accept the purchase, and that in no case could the investment be made without consulting the client first.

37.     On August 17, 2014, Officer 1 told BFG Individual A that due diligence regarding the bonds was consuming significant time because it required taking "multiple views" and balancing a "fiduciary duty to [Placement Agent], and a fiduciary duty to [Hughes's] clients."

38.     That same day, Officer 1 also sent BFG Individual A a memo articulating concerns regarding the bonds.  Among other things, Officer 1 questioned whether the Native American tribe would be legally or financially accountable for the bonds and whether institutional clients would fire Hughes if they were dissatisfied with the investment.

39.     In the e-mail transmitting the memo to BFG Individual A, Officer 1 wrote, in reference to BFG's investment in GMT: "The decision regarding what should be done is yours, not mine. . . . To be fair to both of us, if you made the investment with this in mind, I do not have the moral right to stand in the way and everything is in place to move forward . . . ."

40.     BFG Individual A ignored Officer 1's concerns regarding the bonds.  Between August 22-26, 2014, the BFG-Appointed CIO invested $27,077,436, on behalf of nine of Hughes's clients, in the Tribal bonds.

41.     Hughes did not inform any of those clients about the investments beforehand, notwithstanding its analysis of the clients' investment guidelines indicating that prior consent was required.

42.     Nor did Hughes disclose to its clients that it was investing their funds in investments that would financially benefit parties affiliated with its undisclosed owner.

**Hughes's Clients Unsuccessfully Demand that the Investments be Unwound**

43.     Upon learning of the investments in the bonds, several of Hughes's clients expressed concerns regarding the bonds' valuation and suitability, and demanded that the investments be unwound.

44.     Hughes assured the clients that the Placement Agent had other clients interested in the bonds and was in the process of arranging purchases.  However, despite repeated promises, the Placement Agent never produced buyers for the bonds and none of Hughes's clients have been able to liquidate their positions in the bonds.

**GMT Accepts Additional Financing from BFG to Acquire AAM**

45.     In April 2015, AAM again succumbed to BFG's direction to invest its clients' funds in newly issued Tribal bonds.

46.     On April 1, 2015, BFG and the individual members of GMT entered into a Restated Operating Agreement for GMT.  The next day, BFG financed GMT's purchase of AAM with an upfront capital contribution of $6,120,398.

47.     GMT's purchase of AAM also included a deferred payment of $4,854,420.  The deferred payment was guaranteed by the Annuity Provider's corporate parent and the guaranty was signed by BFG Individual B.

48.     Pursuant to the Restated Operating Agreement, GMT would be renamed Atlantic Capital Holdings LLC (although that name change has not yet occurred) and AAM would become a wholly owned subsidiary.

49.     On April 2, 2015, GMT acquired AAM.

50.     BFG's $8,781,016 capital contribution to fund GMT's acquisition of Hughes and AAM is the vast majority of the capital contributed by any GMT member.

51.     GMT's Restated Operating Agreement provides that AAM's Board of Managers was to consist of four persons, comprised of two Class A Holders (Officers 1 and 2) and two persons selected by the Class B Holders.  At the time, BFG was the sole Class B Holder in GMT.

52.     Pursuant to the agreement, AAM was required to appoint a CIO that was acceptable to BFG.

**AAM Again Fails to Disclose BFG's Ownership Interest in Its Form ADV**

53.     On May 1, 2015, Hughes, now AAM, filed a Form ADV with the Commission containing information about the merger and name change to AAM.

54.     As before, AAM concealed BFG's ownership interests and control, failing to disclose its capital contributions and indirect ownership in its Form ADV.

**AAM Invests an Additional $16.5 Million of Client Funds in Illiquid Bonds That Financially Benefitted BFG's Owners/Control People**

55.     Immediately after BFG funded the acquisition of AAM, BFG Individual A directed Officer 1 to identify investors to invest in newly issued Tribal Bonds.

56.     As before, AAM received information indicating that the Annuity Provider and the Placement Agent, both affiliated with BFG and BFG Individuals A and B, would financially benefit from the sale of the bonds.  According to the Placement Agent's private supplemental placement memorandum ("PPM") for the bonds, the Placement Agent would receive a placement fee of $80,000 and an entity described as another subsidiary of the Annuity Provider's corporate parent would underwrite and issue the annuity contract.

57.     By that point, AAM was also aware that there was no active market for the earlier-issued Tribal bonds.  Since at least November 2014, AAM had received client complaints regarding the original bond investments and had been unsuccessful in efforts to arrange for the Placement Agent to find buyers or purchase the bonds itself.

58.     On April 10, 2015, BFG Individual A sent Officer 1 and Officer 2 a "Class A board member communication request," in which BFG Individual A demanded an immediate conference call to discuss a number of business related items including a "specific action plan for trading flow to [Placement Agent]."  In the e-mail, BFG Individual A pressed Officer 1 and Officer 2 to "maintain their word" with respect to investing AAM funds in the Tribal bonds, and noted, "I am not a member of the board.  However, I was responsible for arranging the financing for the company and have been requested to continue to be the lead in liaising with the investors."

59.     On April 14, 2015, Officer 1 e-mailed BFG Individual A explaining that they "had a challenge regarding bond placement," and proposing that they could "mitigate the

challenge of restrictive investment policies by going directly to our client base (which numbers over 40 clients) and introduce the concept. Exceptions to investment policies occur all of the time, the key is to have the relationship necessary and begin the discussions in advance of the placement."

60.    In the same email, Officer 1 also requested a $500,000 loan, explaining that AAM was suffering from financial difficulty and was struggling to pay its operating costs. BFG Individual A replied: "Let's talk, I don't like e-mail."

61.    After BFG Individual A spoke with Officer 1, Officer 1 agreed to invest client funds in the new issuance of Tribal bonds with the expectation that BFG Individual A would provide AAM with some funding.

62.    On April 16, 2015, AAM invested $16.2 million of client funds in the newly-issued Tribal bonds. On April 23, 2015, an entity described in the PPM as the Annuity Provider's subsidiary sent AAM $305,000, a portion of the funding that Officer 1 had requested prior to making the investment in the bonds.

63.    To make the investment, AAM had used monies maintained in one of its managed funds (the "HY Fund"). HY Fund implements a strategy of making diverse, high yielding, liquid investments through designated investment managers, with no single investment exceeding 5% of the fund's assets. HY's only investor was one of AAM's clients, Pension Fund 1.

64.    The purchase of the Tribal bonds was inconsistent with HY Fund's investment strategy and AAM did not discuss the investment with or obtain consent from Pension Fund 1 prior to making the investment, notwithstanding Officer 1's suggestion in her email to BFG Individual A the prior day that they should "begin the discussions" in advance of the placement.

**Again, AAM's Client Demands the Investment Be Unwound, to No Avail**

65.     On April 23, 2015, AAM informed Pension Fund 1 about the purchase of the bonds and the fact that there was a potential conflict of interest because the individuals who controlled the Annuity Provider and the Placement Agent were also AAM's financiers.  AAM did not tell Pension Fund 1 that those same individuals were also AAM's part-owners, and the largest source of AAM's capital.

66.     Nor did AAM disclose that it had received additional financing from BFG after it approved the Tribal bond purchase.

67.     The next day, Pension Fund 1's Executive Director informed AAM that it "strongly disagree[d]" with the purchase of the bonds and that Pension Fund 1 "should have been provided advance notice of this questionable purchase, particularly due to the fact that a conflict of interest exists in the purchase."  Pension Fund 1 demanded that the bonds be liquidated immediately.

68.     Once again, the Placement Agent promised to find a purchaser for the bonds. However, neither the Placement Agent nor AAM has been able to find any purchaser for the bonds and they remain in HY Fund's portfolio.

69.     Pension Fund 1 sent AAM a notice of redemption of all of its funds in HY Fund on September 24, 2015 and, on October 29, 2015, it notified AAM that it was redeeming the rest of the funds it had under AAM's management.  Pension Fund explained that its decision to end its relationship with AAM was based on Officer 1's "unilateral actions (which [were not yet] reversed) to violate investment guidelines and purchase inappropriate securities with the money contributed by the hard working members of [Pension Fund 1]."

70.     In October 2015, BFG Individual B, on behalf of the Placement Agent, e-mailed

AAM acknowledging the lack of a market for the bonds, and admitted that they could not be priced: "You may want to refer to the risks section of the PPM where it clearly says there is 'no market for these and none is expected to develop in the future' . . . . This situation is clearly true at the moment and given the current investigation any price attributed to these bonds may not be appropriate for accounting or even misleading for any other purposes."

**Continued Harm to AAM's Clients from Further Conflicted Transactions Is Threatened**

71.     AAM has not yet amended its Form ADV to disclose BFG's indirect ownership interest in and control over AAM.

72.     In October 2015, BFG began threatening to take control of Officer 1's and Officer 2's membership units in GMT, thereby gaining full control over AAM.

73.     By letter from BFG's counsel dated October 14, 2015, BFG asserted that Officer 1 and Officer 2 had failed to afford BFG "notice of or the opportunity to participate in any management decisions" and had improperly rejected a candidate for CIO that was proposed by BFG.

74.     The letter provided notice that as a result of Officer 1's and Officer 2's breaches: (a) BFG's membership units, valued at $8,781,016 were immediately due and payable; and (b) BFG was going to appoint a fifth member to the Board of Managers, which would give it a majority. The letter stated that if Officer 1 and Officer 2 did not agree to BFG's exercise of its rights to demand $8,781,016 immediately due and payable and to designate a fifth member to the Board of Managers, BFG would take control of their membership units.

75.     Thus far, BFG has not succeeded in obtaining majority board control of and appointment of a new CIO for AAM. However, representatives of BFG are continuing in efforts to increase their control over AAM, and/or remove current non-BFG management.

76.     As recently as the end of October 2015, BFG Individual B was also urging AAM to market to AAM's advisory clients a French private equity fund of funds (the "French Fund") that had recently come under his control and is part of Annuity Provider's corporate family, and to assist it with raising funds by the end of the year.  In an email to Officer 1, BFG Individual A supported BFG Individual B's pitch.

77.     Thus far, AAM has not agreed to invest any of its clients' funds in the French Fund.  However, if BFG's representatives succeed in their efforts to gain complete control over AAM, they will be positioned to invest AAM's clients' funds in the French Fund.

### FIRST CLAIM FOR RELIEF

#### Violations of Sections 206(1), 206(2) and 206(4) of the Advisers Act and Rule 206(4)-8 thereunder

78.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 - 77.

79.     From at least August 2014 through the present, AAM, an investment adviser, directly or indirectly, singly or in concert, by the use of the means or instruments of transportation or communication in interstate commerce, or of the mails, employed and is employing devices, schemes and artifices to defraud investors, and has engaged and is engaging in transactions, practices and courses of business which operate as fraud and deceit upon these investors.

80.     During that period, AAM also served as investment adviser to a pooled investment vehicle, and (a) made untrue statements of material fact or omitted to state a material fact, necessary to make the statements made, in the light of circumstances under which they were made, not misleading, to an investor in the pooled investment vehicle; and (b) engaged in

15

an act, practice, or course of business that is fraudulent, deceptive, or manipulative with respect to any investor or prospective investor in the pooled investment vehicle.

81.     By reason of the activities described above, AAM has violated, and is violating, Sections 206(1), 206(2) and 206(4) of the Advisers Act, 15 U.S.C. 80b-6(1), 80b-6(2), and 80b-6(4), and Rule 206(4)-8 thereunder, 17 C.F.R. § 275.206(4)-8.

## SECOND CLAIM FOR RELIEF

### Violations of Section 207 of the Advisers Act

82.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 - 77.

83.     From at least August 2014 through the present, AAM willfully made untrue statements of material fact and omitted material facts in reports filed with the Commission by failing to disclose in its Form ADV BFG's capital contribution to, and indirect ownership interest in, AAM.

## PRAYER FOR RELIEF

**WHEREFORE,** the Commission respectfully requests that the Court grant the following relief:

## I.

An Order temporarily and preliminarily, and a Final Judgment permanently, restraining and enjoining AAM, its agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Sections 206(1), 206(2), 206(4), and 207 of the Advisers Act, 15 U.S.C. §§ 80b-6(1), (2), and (4) and 80b-7, Rule 206(4)-8 thereunder, 17 C.F.R. § 275.206(4)-8.

## II.

An Order temporarily and preliminarily appointing an independent monitor for AAM with sufficient powers to preserve the status quo and protect AAM's client's funds from being used by AAM to make further investments without full and appropriate disclosures.

## III.

An Order temporarily and preliminarily requiring AAM to provide the independent monitor and the Commission with three business-days' notice of any transaction in which AAM seeks to transfer assets to any person or entity holding a direct or indirect ownership interest in AAM.

## IV.

An Order providing that the Commission and AAM may take expedited discovery in preparation for a hearing on the Commission's application for preliminary injunctive relief;

## V.

An Order temporarily and preliminarily enjoining and restraining AAM, and any person or entity acting at its direction or on its behalf, from filing a voluntary or involuntary petition in bankruptcy on behalf of or against the Defendant without first seeking leave from this Court, with at least five (5) days' notice to the Commission;

## VI.

An Order temporarily and preliminarily enjoining and restraining AAM, and any person or entity acting at its direction or on its behalf, from destroying, altering, concealing or otherwise interfering with the access of the Commission or independent monitor to relevant documents, books and records;

## VII.

A Final Judgment ordering AAM to disgorge all ill-gotten gains and prejudgment

interest;

## VIII.

A Final Judgment ordering AAM to pay civil money penalties pursuant to Section 209(e)

of the Advisers Act, 15 U.S.C. § 80b-9(e); and

## IX.

Such other and further relief as the Court may deem just and proper.

### **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands that this

case be tried to a jury.

Dated:     New York, New York
           December 15, 2015                    SECURITIES AND EXCHANGE
                                                COMMISSION


                                         By: _Sanjay Wadhwa_____
                                                Sanjay Wadhwa
                                                Senior Associate Regional
                                                Director

                                         Brookfield Place
                                         200 Vesey Street, Suite 400
                                         New York, New York 10281
                                         (212) 336-1023 (Brown)
                                         Email: brownN@sec.gov

Of Counsel:
Andrew M. Calamari
Nancy A. Brown
Adam S. Grace
Tejal D. Shah